We're here on behalf of Ms. Rhonda Button. She was hired by the Sioux Line Railroad in 2001, and was the sole female train dispatcher at the Kansas City bridge location until 2016. Now, you'll see that this case is against the Canadian Pacific Railroad, but all that happened is that railroad lines railroad that merges with railroads started up Sioux Line and ended up Canadian Pacific. And while there is some dispute about when that occurred, there is no dispute that her supervisor, Nicole Marti, didn't become her supervisor until April of 2001. We were here on three claims. We allege three areas of objection to the court ruling. The first one is about certain affidavits that were used to support summary judgment, which we believe were sham affidavits. And then the second is that we don't believe that they met the standard to dismiss our Missouri Human Rights claim. And the third is on our FMLA claim, saying we believe we established the prima facie case to move forward. I'm going to interlace the facts with the arguments so that we don't waste too much time with me just talking nonsensically. The first thing that we allege is that the sham affidavits that they used to support summary judgment should not have been considered. Why do you characterize them as sham affidavits when I guess that term, if it's ever used, is usually used where you're trying to create something that doesn't exist? That's exactly what we're going for. What, in this case, my argument is we took the time to depose all their people in Minnesota. One of those people we deposed was Ms. Nicole Marte. If you look at the records and you look at the transcript, she was asked extensively about what they considered and what their criteria were when they decided to terminate my client. She gave us, there was a chart, and the only things that they used were on that chart, according to her testimony. We asked her if there were any other notes. We asked her if there was anything she could recall about the conversation that was discussed with regard to everything on the paper and anything that was not on the paper. Closed out all of those boxes. But then, in summary judgment, she came forward with two new criteria that had never been discussed. It wasn't in the EEOC documents. It wasn't in the prior pleadings. It wasn't in any of the deposition testimony that we took. It just mysteriously appeared when they were filing for summary judgment. Thus, we used the sham affidavit. I understand that it's typically, and I mentioned that in the briefing, that sham affidavits are typically, you're arguing to make a claim. But here, they were arguing to make a defense because our argument, our prior argument was, even if we go through all these criteria, they are subjective. And we can show you why these subjective criteria should not have been a basis to select my client. So in summary judgment, after those depositions, for the first time, these affidavits show up and they make arguments that were never mentioned and from where, we don't know. I think if you look at the sham affidavit cases, it says, one, the witness had to be confused, or they needed clarity to the questions, or three, they had act that you have to show, and three, you have to show that there was an actual contradiction. Here, there's no question that there's a contradiction. And there's no explanation or saying she didn't understand my questions. In fact, I close every deposition by saying, is there anything that you testified to or any questions you asked that she didn't understand? Answer is no. And so for them to then come forward with new criteria that there's no way for us to rebut because it wasn't disclosed during discovery, even after her deposition, I would say is a sham affidavit. With regard, the same would hold for Ms. Sherry Perkins. Ms. Perkins didn't remember anything specific. And I quote all of the language in the documents and our reply brief. She didn't remember anything specific. But mysteriously, when it came time to file an affidavit to support summary judgment, she could say specifically all these things that they talked about in the meeting that weren't in the criteria that was disclosed to us, specific conversations, and I mean, her testimony was specifically, I don't recall anything specific other than we talked about some guy that was lazy. Does it matter here that the affidavits in question, the sham affidavits, so-called sham affidavits, were submitted by the move-in? And all the sham affidavit cases seem to be the opposite. And I think maybe Chief Judge Smith was getting at this, which is it's the person who's responding to summary judgment saying, no, no, here's a genuine issue of material fact. Here, you can just ignore evidence potentially that the move-in has, or at least give it in a light most favorable to the other parties. So does it make a difference if this is just a different procedural posture? Well, Your Honor, I would submit that it's about fundamental fairness. We took the time to depose her. We took the time to go through all of the criteria that Canadian Pacific said that they used for this. We asked her if there was anything else, any other documents, any other notes. There are no notes of the meeting. There are no recordings of the meetings. There are no additional e-mails that say these are the criteria that we considered. And then to come forward with evidence that you have not disclosed, I would say the theory what's good for the goose should be good for the gander. And if I can't come forward with new affidavits from the plaintiff, how in the world can you come forward with affidavits and information and evidence that was never disclosed? I mean, if you're saying there were five things that were considered, and then we show, well, what about this, what about this, then all of a sudden I don't get to redepose her based on the affidavit she gave as summary judgment. That's simply not fair. There's no way, I mean, if we're going to do this, there's no way for us to controvert that. And we still could controvert some of it, but it was through going and getting other people to tell us, well, did this really happen? Like when they say, well, we considered the fact that she didn't know how to use their three communication systems. Well, she only knew how to use one. And then we go back and the records show, no, she actually knew how to use two of the three. Well, why didn't you offer her a chance or training to do the third one would have been my question in the deposition. Because you know what they did? You had six people in Kansas City and you had people in Minnesota. They moved two males from Minneapolis to come to Kansas City to be trained on that third language that they didn't know by my client. And then after they did that, they called it prequalification. Well, you can prequalify men to learn this third communication system, but you didn't give her a chance to learn the third one. And you're saying, well, because she doesn't know all three, that's a reason to not to terminate her employment. And so how is it that they can do that? And we clearly know that the sham affidavits and I mentioned in my briefing, it's typically applied to plaintiffs because I've never seen this happen before, to where you just have been deposed for hours and all of a sudden you remember new things that was never disclosed. Ms. Marte did it and Ms. Perkins did it. And so the court and my problem with it is the court specifically relied on it. We briefed the issue. We told them the problems with it. And then we still said, here's what we have, but this still isn't fair. And it's fundamentally prejudicial for you to allow them to bring in new evidence that has never been disclosed. And what way did the court rely on it? And if you'll look at it, the court cited to Ms. Marte and Ms. Perkins' affidavit throughout. And that's how they got to the fact that, well, they used objective criteria. And I'm like, okay, the objective criteria. Well, the objective criteria was supposedly training in three communication language and knowledge of the areas that were added to KC. Well, we can see by the records that they didn't go check her personnel file to see what areas she had already worked. The one area she hadn't worked, according to her testimony, was that, you know what, it was a little small thing and there had not been anything to add. And so that's not, I mean, those are things we have to go and find in our reply because those things were never discussed. They had a matrix. None of these things that they added to the affidavit were on the matrix. The only things that they considered, at least according to their matrix, was performance management program, efficiency ratings, discipline, attendance, and other ratings. And when we looked at their attendance, we're like, wait a minute, you're listing her because she had gone on an FMA leave at the start of February. So she went on FMA leave. She applied for FMA leave and went out on the 12th. On the 18th, Ms. Marti is notified. So six days later. Seven days later, they then have this meeting to decide who they're going to come in. And so six days after her going, being notified, this is listed on the spreadsheet and then that's one of the considerations that they used when they were making the termination decision. And so for them to come up with new criteria that we couldn't have deposed them on or gotten evidence on, I don't think it should be considered. I think it's just fundamentally unfair. And I think, like I said, Ms. Perkins, she specifically contradicts her testimony because she's citing facts and evidence when she said, I have no memory of these things. I don't remember anything specific. I have no notes to refresh my recollection. How then can she sign this very detailed affidavit about what actually happened in the meeting? I don't know. Well, could she have reviewed documents? Could she have familiarized herself with things that refreshed her recollection? Was there anything she could use to refresh her recollection? The answer was no. And I gave her the spreadsheets from the meeting, so there's no argument that the documents that they told us they relied on, she had in front of her. And so I can't fight a fight with my hands tied behind my back. And if you're going to use these affidavits, you shouldn't prepare them for the depositions and have them be truthful and honest because that's what they swear to. They're going to provide complete and truthful answers. Well, what if we just disregard the affidavits? Didn't Perkins already give other reasons why your client was laid off? She said, Perkins, I thought, testified that your client was one of the lowest performers. So if you go back, those are things that were related to the charts that I talked about that were provided to them, and they had, like, this is your efficiency rating, this is how we did this matrix. Well, the testimony showed that those things were so subjective that, one, some of the people in the room didn't know the people they were talking about. Two, the efficiency ratings, my client has a specific letter from them. In January of 2016, the end of January 2016, the 23rd, in fact, that says, you've not had any discipline, you've had a great 2015, here's a gift card, here's all of this. But on their matrix, they list, well, she had an incident in January of 2015, which would have been before or in 2015. And the answer to that is no. That was something that happened in 2014. You pulled it over because it helps you say that she had discipline within the two-year time period. That was our argument, and there's evidence to show that it actually happened in 2014. They were also, like I said, the guys who were in Minneapolis and the people that were in Kansas City, different supervisors. But they were given efficiency tests, and it was a random, you have to take this efficiency test, and the supervisors have to fail so many people. There was also testimony that supervisors were passing people for tests they didn't take. So how is that something that you can say is objective? And that is the sworn testimony. Thus, you go make up two new criteria. Why is objective criteria required to avoid violating the civil rights laws? Can't you make subjective decisions that are nondiscriminatory? If you can say that they're nondiscriminatory, we provided evidence that one of the managers had said something about, they came down to Kansas City, it is not palatial at all. She's the only woman to have worked there full-time that we know of, and said, female supervisor comes down from Minneapolis and says, this is not a place a woman should work. Within a month, my client is terminated. And the argument there is, we can show you some evidence that there was animus towards her being a woman that works in that facility. We can show that she made complaints about safety and other things to Ms. Marti. And so what we're saying is, all the, remember on the Missouri Human Rights Act, it has to be one of the hundred factors that were used. We think we've met that. We think that we should get a chance to take her case and let a jury decide. I think with regard to the FMLA, because I'm about to run short, they used the affidavits extensively with regard to FMLA. They made this argument, like, and the judge found, well, she took FMLA leave in 2010, and she wasn't terminated. Well, judge, that was a different supervisor, and we can take a different employer, different merger. 2016, when she takes it, it's right before they make their decision. They list it on the sheets. And the other example that we have is we had an affidavit from an employee in Minneapolis. They did a reduction in force allegedly. Two people, two of the people that were selected, a woman who told Ms. Marti, I'm going out for cancer surgery this week. The next day, she was terminated. And that's in the affidavit. The other person that was selected was a male who had just taken FMLA. So we can show that there's some evidence that they are riffing or terminating people who were using FMLA. And there's evidence that they didn't think that, or management expressed the opinion that they didn't think that. Did that evidence indicate that the individuals were similarly situated to Ms. Burton? In their argument, they have to be because they're saying these positions are the same. It's just in different locations. And so, and I think the judge just said since it was the same employer, there can't be FMLA bias here because, and I think one of his other arguments is there were women in the room when these decisions were being made. Well, I think there's plenty of case law that we cited that just because you're a woman doesn't mean you won't discriminate or have animus towards another woman. And just because you're a man doesn't mean that you wouldn't have animus. I mean, so I don't think that argument carries a day. And I think that we should have been allowed to present our evidence to a jury. And that they sham affidavits or however we wanted to find them. The only case law is on the plaintiff side that I could find, and I cite that in there. There were some other jurisdictions, but it was a little, I didn't want to just, I was like, well, we have these shams, period. So, thank you, Your Honor. Thank you, Mr. Williams. Mr. Neske. Thank you, Your Honors. May it please the Court, honorable judges. First, the declarations of Nicole Marthy and Sherry Perkins are not sham declarations. And to the extent the district court relied on them in its summary judgment order, it did so properly. Second, the district court properly reviewed the record in this case against the governing legal standards and correctly held that Ms. Button's evidence fell short of establishing a prima facie case of gender discrimination under the Missouri Human Rights Act. And third, the district court did not improperly weigh evidence or fail to credit Ms. Button's evidence on her FMLA retaliation claim. Instead, the district court correctly concluded that the evidence was legally insufficient to prove Ms. Button's discharge from the RIF was pretext for intentional retaliation. And let me address each of those points further. We submit that the standard of review on the declarations is abuse of discretion. But, Your Honors, regardless of what standard of review applies to the issue that counsel just raised, the fact is that the district court did not err in considering the declarations because they do not contradict prior deposition testimony. And I'd also point out it is true. The sham affidavit rule is typically and only seen insofar as the non-movement trying to create a fact issue to avoid summary judgment. So it's also different in that regard. But the court need not even reach that. They can resolve this issue multiple ways. The first being that this testimony is not inconsistent. The only error committed here was in counsel not questioning witnesses fully and completely. And I wanted to detail that for the court's benefit here. With respect to Ms. Marthy, plaintiff seeks to manufacture a contradiction by taking one small portion of Ms. Marthy's deposition testimony. Ms. Button fails, however, to include another portion of her testimony that directly relates to the very issues that she further explained and gave more detail to in her declaration. Specifically and critically, Ms. Marthy testified at her deposition that desk qualification was discussed at the February RIF meeting. She said, quote, I know we talked about the desks and what they were qualified on. Ms. Button's counsel asked her one question. What that meant to be qualified on. And she further explained. So which desk they were qualified at. So Brad was Iowa, Missouri qualification. Rhonda, Ms. Button, was Kansas City. What desk they were qualified on, which one they were working or were able to work on on their own. The declaration then explains what that means. No further questions were asked of Ms. Marthy. But the declaration explains what a desk qualification means. And it included three subdivisions. Iowa, Missouri, Kansas City. Each of those subdivisions had territories under each of those divisions. What happened in the RIF was they were consolidating the Missouri subdivision, which was comprised of seven territories, and going to disperse that to Kansas City and Minneapolis. Kansas City pre-RIF, where Ms. Button worked, only had one subdivision. The RIF was going to result in a larger territory of coverage that those operations supervisors were going to be responsible for post-RIF. That is what Ms. Marthy is speaking of in talking about desk qualifications. Likewise, communication modes. You heard counsel speak to what employees were qualified. There are three different communication modes. Each of these dispatchers. Dispatchers are like air traffic controllers. They're responsible for the movement of trains in all these various territories. And obviously, these territories are very different in and amongst each other. And they use different and require training and experience on the communication modes. And that was the other point that Ms. Marthy was explaining as it related to desk qualification in the three divisions. There's no contradiction. These are the elaborations. Even if you were to apply the sham affidavit rule, it is not a sham affidavit where the testimony is intended and clarifies and elaborates on the information provided. And that is exactly what that declaration does. It's not contradictory. It's not a sham. Ms. Button then takes issue with a single paragraph in Ms. Perkins' declaration. I think that's an important point to make. To the extent the district court relied on Ms. Perkins' declaration, the majority of the declaration relates to who had taken FMLA, various HR-related matters. The only point that plaintiff takes issue with is paragraph 12 of her declaration where she spoke to recollection of discussions at the RIF meeting where they spoke of a concern with Ms. Button not being able to handle this larger territory post-RIF. That's the paragraph at issue. And even if the court had concern with that paragraph, it's immaterial. Because that same concern and that same testimony exists many other places in the record. Ms. Amanda Cobb spoke to it in her declaration. It's spoken of in the EEOC response statement from years before the concern about Ms. Button not being able to handle the larger territory. Ms. Marthy spoke to it. There's evidence about that point elsewhere. So to Judge Colleton's point about could any problem be disregarded, yes, because there is other evidence about that point. There was also nothing suspect or suspicious about Ms. Perkins' amended declaration. Counsel didn't touch on that. It's in the briefs. But I just want to briefly point out she merely corrected a factual error on a completely collateral and different issue. And it doesn't change Ms. Perkins' declaration on that point. Let me then move over to the gender discrimination claim. Ms. Button concedes she must make a heightened additional showing of gender discrimination here because it is a RIF case. And she has not done so. She's brought three arguments before the court. First, she relies heavily on this alleged remark that an indirect non-decision maker, Ms. Peterson, makes prior and unrelated to the RIF meeting that occurs. It's not direct evidence and it's not inferential evidence, as I'll explain. Second, she argues that similarly situated male employees were treated better. And third, that CP's stated reasons have substantially changed over time. The district court properly reviewed each of these arguments that were all raised below and correctly held that they legally fail on this evidentiary record. First, the single alleged remark Ms. Button claims Ms. Peterson made to her about women not being a good place for women in Kansas City. First, the remark was made outside of and unrelated to any decisional process pertaining to the RIF, undisputed. Also undisputed, that Ms. Peterson was not Ms. Button's direct supervisor and she was not a decision maker in the RIF. That is by definition a stray remark. And it fails legally and it does not constitute direct evidence. And the district court was absolutely correct in making that holding. And the district court was further correct in rejecting that remark insofar as it could form the basis of inference to a prima facie case or this additional argument that Ms. Peterson was closely involved in the decision making. Ms. Peterson does not specifically consider these undisputed facts. It's undisputed that Ms. Peterson was not present. She wasn't at the RIF meeting in February of 2016. It's undisputed there's no record evidence that Ms. Peterson provided any comments or input to an email that Ms. Cobb sent around before the meeting. And it's undisputed that Ms. Peterson was not present nor participated in the discharge meeting for Ms. Button. What was Peterson's title? She was a manager and she was a chief dispatcher, I believe it was, in Minneapolis. So she was in Minneapolis. She happened to be in Kansas City for a couple weeks in early February. And that was where Ms. Button interacted with her. But she was a manager but would have been an indirect manager to Ms. Button. And she was located and worked in Minneapolis. Did she give input to the committee or the group that made the RIF decisions?  And that's a critical fact to the record. The only evidence that Ms. Button has come forth with is that Ms. Peterson was a recipient of over a dozen recipients who received a spreadsheet prior to the RIF meeting by Ms. Cobb. But there is no record evidence and Ms. Button has put forth no evidence that Ms. Peterson provided any comments or any input to the email. Was that the spreadsheet that ranked employees with the lowest ones being subject to RIF? It was a spreadsheet that collected a lot of data. So it collected the PMP, the performance ratings that they reviewed, the objective criteria. It provided what desk they operated on, as I spoke of earlier. It provided the data of all 16 operations supervisors. But there's no record evidence that she, Ms. Peterson, there's no evidence that she provided any comments to that. There is no evidence of her active involvement in that decision. And when you particularly compare the cases that the plaintiff relies on for the proposition of this being of any kind of relation to the decision, they're just, the records are not comparable. The cases that are cited involve supervisors who actively participated in the meeting, were present at the discharge meeting, who actually had some participation, and there's simply no evidence of that here on this record. Likewise, on a similarly situated requirement, the district court did not err here as well. The district court did not improperly weigh evidence against Ms. Button. Rather, the judge properly applied the governing legal standard against the record facts. As is well established, the legal standard for similarly situated is a rigorous one. And it requires similarity to be shown in all material respects. And here, the district court reviewed that record properly and found the evidence insufficient as a legal matter. Consider these undisputed facts in the record. The spreadsheet that was used in the RIF meeting shows that Ms. Button did not have a comparable efficiency rating to other ops supervisors. In fact, her efficiency rating, failure rate was at 19%, far and away more than any other employee, male or female, that was reviewed in that meeting. Also undisputed, Ms. Button's disciplinary record. She had two disciplinary infractions in the two-year look-back period, 2015-2014, that the committee looked at. The only other ops supervisor with greater disciplinary record was selected for the RIF, and his employment was terminated. And the only other employee with two infractions, he had more experience in the territories I spoke of regarding the Iowa-Missouri qualifications. He had more territory qualifications than the plaintiff, and therefore was not similarly situated in their respective qualifications. That's not improperly weighing the evidence by the court. To the contrary, those are undisputed record facts that when reviewed against the rigorous analysis for the similarly situated requirement, simply fail as a matter of law. Briefly, the reasons by CP have not changed.  It's always been the RIF. The reasons, that reason has never wavered. The cases that require a substantial change over time in looking at those cases as compared to this record, those are directly contrary cases, directly contrary reasons. The starkest example of that is this Briscoe case that the plaintiff relies on. There, at the time of discharge, the employer said the reason for discharge was because the plaintiff didn't show up to work when scheduled. Then, in litigation, the employer said the reason for discharge was due to her performance. She lied to a manager, there were customer complaints, and she was insubordinate. You cannot reconcile those two separate reasons together. They're directly contradictory. This button here has no such evidence. The RIF has and always has been the reason for the discharge, and therefore there is no contradiction in those reasons. I have two minutes left, and I just briefly want to touch on the FMLA claim before closing, and that is the following. Really quickly, before you jump into it, does the heightened standard from Holly and some of these other cases apply in the FMLA context? That is, I don't know that we've extended there. I'm not sure it matters, but I'm curious what your response to that is. You know, Your Honor, I don't know that I can say that for certain, whether they have or not. What I can say is that the FMLA retaliation claim is an intentional retaliation requirement. So, to the extent the Missouri Human Rights Act may have a contributory factor element, the additional showing there under the RIF is absolutely, and the plaintiff concedes it applies to that claim. But I don't know offhand if it does on the FMLA, but I do know intentional retaliation is the required standard, and that's where Ms. Button fails in her record evidence here. And that is because of this. There is no pattern of discrimination for employees who took FMLA. Consider these, again, undisputed record facts of the 16 supervisors who were reviewed. Op Supervisor Lyon, he submitted a request for FMLA only a month before Ms. Button received all of it, not terminated. Supervisor Coit, he took FMLA leave in 2014, he was not terminated. Supervisor Lace, a female, she took FMLA in 2015, not terminated in the RIF. Two managers on the committee took FMLA, and without repercussion. And then Ms. Button, Ms. Button herself, took and requested. All the FMLA she requested in 2016 was from February 10th to March 4th. She returned to work, she got all her benefits, the request was granted, she returned to work and admits she recovered no loss of pay or benefits whatsoever. And in 2010, it is factually incorrect that that was not CP who was her employer in 2010. The STB is cited in our brief. CP bought the IC&E in 2008. So 2010, Ms. Button, again, received all the FMLA that she requested at that time without repercussion. For these reasons, we submit the district court's thorough and comprehensive decision should be affirmed in all respects. Thank you. Thank you, Mr. Doneski. Mr. Williams, you used all your time, but we'll give you a minute to... Yes, but when your light turned yellow, you were into your five minutes. Yeah. All right. But we'll give you a minute to respond to something that you may have heard that we should be advised of to properly assess this case. And I apologize, I guess I thought I still had time. One, when she talks about the criteria, we talked about two different RIFs. One of the RIFs was in Minneapolis. And that's when she talked about the criteria in Minneapolis. And that's when she talked about the seat. When they talked about it, when we talked about it in Kansas City, it was not a criteria on the sheet, and it was not discussed. And when we went through it, it says, I'm deposing Ms. Perkins. Do you remember anything that was said about, or do you remember anything that was said about any specific individual? No. No specifics that I can remember. The only one that jumps out in my mind was about Clifford Thompson and that he was lazy. Anything else that you can remember that was said about any employee? No specifics. It was all going through everybody and ruling their performance compared to everybody's and trying to identify the lowest performers. And then I ask her, you previously testified that you don't have any notes from that meeting. Correct. I'm out of time. But I would just respectfully submit that the briefing speaks for itself, and I believe that we have clearly established that they did not use the same criteria as they applied anywhere else. Thank you, Mr. Williams. Thank you also, Ms. Doneski. We appreciate the argument you provided to the court today in the briefing. We will take the case under revised vote.